IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of A.M. | No. 88001-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — A.M. called 911 after experiencing pain in his arm and not sleeping for days. Evergreen Hospital admitted A.M. and two days later, he was transferred to Valley Cities Recovery Place. At Valley Cities, A.M.'s medical notes stated that he was very paranoid and delusional, he slept poorly, and he was inconsistent in taking his medication. After a probable cause hearing, the court held that A.M. was gravely disabled under prong (a) of RCW 71.05.020(25) and ordered a 14-day commitment. A.M. appeals. Because substantial evidence does not support that there was a risk of serious physical harm resulting from A.M.'s inability to take care of his essential needs of health or safety, we reverse.

FACTS

In January 2025, A.M. called 911 after experiencing pain in his arm and not sleeping for days. Evergreen Hospital admitted A.M. and during his physical exam, his doctor noted that A.M. was alert, emotionally labile, in mild acute distress, and had disorganized speech. Evergreen staff observed that A.M. was

"clearly wearing soiled clothing" and "the smell of urine was pungent." A.M.'s doctor noted that he had a history of chronic pain and polysubstance abuse.[1] A.M.'s medical notes also stated that A.M. experienced vomiting and there was a concern for possible Alprazolam withdrawal. A.M. struggled to give a cohesive answer about his medication and medical history. In A.M.'s mental health exam, Evergreen's social worker noted that A.M. was tangential and had "increasing difficulty staying on topic or answering questions."

While at Evergreen, A.M. refused medication and could not state what medication he was on. A.M. shared that he did not sleep for over four days. A.M.'s doctor noted that he was unable to appropriately discuss a safe discharge plan. A.M. could not tell his doctor how he could get home or what next steps could look like. Two days later, Evergreen discharged A.M. and transferred him to Valley Cities Recovery Place in Kent, Washington for further treatment.

A.M.'s Stay at Valley Cities Recovery Place

On February 1, 2025, at Valley Cities, A.M.'s urine sample tested positive for THC,[2] benzodiazepine, and buprenorphine. A.M.'s medical notes stated that A.M. was very paranoid and delusional and did not have insight into why he was hospitalized and his need for treatment.[3] A.M.'s doctors were concerned with

---

[1] A.M.'s medical notes also stated that A.M. was on opiates for quite some time and started to transition to buprenorphine. A.M. was not taking buprenorphine regularly.

[2] Tetrahydrocannabinol.

[3] A.M. claimed that his throat and heart were damaged by the emergency department staff. However, his medical staff noted that he spoke fine without labored effort, and he had no physical marks on his neck.

A.M.'s inconsistency with getting quality sleep. During treatment, A.M took his medication inconsistently; some days he refused it, while other times he took it without complaint. A.M. also consistently believed that he needed a Computed Tomography (CT) scan, but medical providers assessed him and concluded that he did not need a CT scan. A.M. also indicated concerns that he was losing weight.[4] Medical staff noted that A.M. was "not making rational and reality-based decisions independently about his medical needs and medical care."

Involuntary Treatment Hearing

A.M.'s brother testified that he and A.M. lived together for over five years and he interacted with A.M. daily. A.M.'s brother stated that A.M. experienced several traumas in the past year and a half.[5] A.M.'s brother observed that A.M. gets fragmented when he gets less sleep. He also testified that his biggest concern about A.M. was his lack of sleep and weight loss.[6]

Based on the testimony at trial, the court found that A.M. suffered from a behavioral health disorder, specifically, a psychotic episode ruling out a mood disorder, primarily bipolar disorder. The court also found that no concern remained that A.M. was in withdrawal from opiates and benzodiazepines. The court found that A.M. was noted at times to be tangential and disorganized,

---

[4] A.M.'s medical notes documented that he was "demanding to be sent out to the hospital due to concerns of weight loss, reporting, [] I am losing weight and I need my neck x-rayed still."

[5] A.M.'s brother testified that their mother passed away, their cats passed away, and their father's health declined and they were taking care of him at their home.

[6] A.M.'s brother also testified that before his hospitalization, A.M.'s weight dropped dramatically, but it looked like it was going back up.

unable to engage with hospital staff, but at other times he was organized. A.M. was also inconsistent with taking his medication. The court also noted that A.M. was labile and still had difficulty sleeping. Ultimately, the court found that A.M. was gravely disabled under prong (a), and that continued detainment would allow the hospital "to provide continuous care and treatment to [A.M.] in an effort to break the cycle and restore him to satisfactory and safe functioning in the community." The court ordered a 14-day commitment. A.M. appeals.

ANALYSIS

Under RCW 71.05.230(1), a 14-day petition of involuntary treatment can be initiated if the person's condition is "caused by a behavioral health disorder and results in . . . the person being gravely disabled." If the court finds by a preponderance of the evidence that the person "is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment." RCW 71.05.240(4)(a).

When reviewing an order for an involuntary commitment, we are limited to "determining whether substantial evidence supports the findings and, if so, whether those findings support the conclusion of law and judgment." *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). "Substantial evidence is 'evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" *T.C.*, 11 Wn. App. 2d at 56 (quoting *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998)). The burden of proof is on the

appealing party "to demonstrate that substantial evidence does not support a finding of fact." *T.C.*, 11 Wn. App. 2d at 56.

<u>Timeliness Requirements Under RCW 71.05.153</u>

A.M. claims that the State violated RCW 71.05.153 because at Evergreen, a designated crisis responder (DCR) did not detain A.M. until sixteen and a half hours after he was interviewed by a social worker. A.M. asserts that this delay is four and a half hours longer than statutorily allowed.

Washington requires that within three hours after a person arrives at an emergency department, the person must be "examined by a mental health professional or substance use disorder professional."[7] RCW 71.05.153(4). "Within twelve hours of notice of the need for evaluation, not counting time periods prior to medical clearance, the designated crisis responder must determine whether the individual meets detention criteria." RCW 71.05.153(4). In addition, RCW 71.05.153(5) states that "dismissal of a commitment petition is not the appropriate remedy for a violation of the timeliness requirements" except in cases when the hospital totally disregards the involuntary treatment act (ITA), ch. 71.05 RCW.

A *total disregard* is "not a mere oversight but amounts to a complete failure to treat the ITA with respect or attention." *In re Det. of D.H.*, 1 Wn.3d 764, 777, 533 P.3d 97 (2023). " '[T]he requirements of the ITA are not totally disregarded in every case where some aspect of the act has been violated.' "

---

[7] The three hours does not include time periods before medical clearance. RCW 71.05.153(4).

*D.H.*, 1 Wn.3d at 777 (quoting *In re Det. of A.C.*, 1 Wn.3d 731, 745, 533 P.3d 81 (2023)).

Evergreen admitted A.M. at 2:44 p.m. on January 30, 2025. A.M. was medically cleared at 4:00 p.m. A social worker completed A.M.'s mental health assessment at 5:30 p.m., and the hospital called a DCR at 10:20 p.m. The next day, at 10:00 a.m. on January 31, 2025, a DCR detained A.M.

The first statutory requirement was met. After A.M. arrived at the hospital's emergency department, he was medically cleared at 4:00 p.m. and a social worker completed his mental assessment at 5:30 p.m. This is within the statutorily required three-hour window. However, the hospital did not call a DCR until 10:20 p.m. and the DCR detained A.M. at 10 a.m. the next day. In total, it was 16 and a half hours from the time the hospital notified a DCR that an evaluation was necessary to when a DCR detained A.M. This is beyond the 12-hour requirement under RCW 71.05.153(4).[8]

The record does not provide evidence regarding the reason for the delay from when the hospital notified the DCR to when the DCR examined A.M. At A.M.'s probable cause hearing, the State asserted that "[t]here was a delay in having the DCR called to the emergency room there and it was longer than it's supposed to happen." Further, the State contended that the hospital was not intentionally disregarding the statute. Rather, the State claimed that logistically

_____

[8] The parties disagree about how long the hospital improperly held A.M. A.M. contends that he was improperly held starting when he was medically cleared, a total of four and a half hours longer than the ITA allows. The State asserts that A.M. was improperly held once the social worker met with him, for approximately three hours.

and "practically speaking, they weren't able to get there at the exact time that the statute requires." In response, A.M.'s counsel did not assert that the delay was intentional or a disregard of the ITA. Rather, A.M. highlights that the lack of evidence regarding why the delay occurred should be construed against the hospital. This is counter to case law. In *In re Det. of Swanson*, the court held that "if the intent of the statute is to be fulfilled and absurd results are to be avoided, dismissal cannot turn on the vagaries of scheduling." 115 Wn.2d 21, 31, 804 P.2d 1 (1990). Since the evidence does not support that Evergreen totally disregarded the ITA, we decline to reverse based on timeliness.

Gravely Disabled

*a. Legal Standard*

Under RCW 71.05.020(25)(a), *gravely disabled* is, in part, "a condition in which a person, as a result of a behavioral health disorder . . . is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety."

The definition of *gravely disabled* was "intended to broaden the scope of the involuntary commitment standards in order to reach those persons in need of treatment for their mental disorders who did not fit within the existing, restrictive statutory criteria." *LaBelle*, 107 Wn.2d at 205-06. Under prong (a) of gravely disabled, "the danger of harm usually arises from passive behavior." *Id*. at 204. "The potential for harm must be 'great enough to justify such a massive curtailment of liberty.' " *Id*. (internal quotation marks omitted) (quoting *In re Det. of Harris*, 98 Wn.2d 276, 283, 654 P.2d 109 (1982). Also, our Supreme Court

7

has held that prong (a) requires a "showing of a substantial risk of danger of serious physical harm resulting from failure to provide for essential health and safety needs." *Id.* at 204. The State must show "tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *LaBelle*, 107 Wn.2d at 204-05.

### b. Evidence of Substantial Risk of Danger of Serious Physical Harm

A.M. asserts that the court erred in finding him gravely disabled because no substantial evidence showed that he was in danger of serious physical harm. We agree.

In the findings of fact,[9] the court detailed that A.M.'s mental health disorder resulted in a failure to provide for his essential health and safety needs. The court noted that A.M. was only sleeping a couple of hours a night, he was losing weight, and he was admitted to Evergreen in a disheveled state with poor hygiene. The findings of fact also detailed that A.M. exhibited psychosomatic fixation of physical health issues. Ultimately, the court found that A.M.'s disorder had a substantial and adverse impact on A.M.'s cognitive and volitional control.

Although the court established that A.M. struggled to care for his essential needs, the court did not note any evidence that demonstrated a substantial risk of serious physical harm existed because of his inability to care for himself. The court found that A.M.'s "psychiatric symptoms [are] interfering with his ability to

---

[9] The court also adopted its oral rulings announced at A.M.'s hearing.

seek out physical or mental healthcare in a logical and reality-based way." In the court's ruling, it found that A.M. was not sleeping, he refused medication, and he was not eating much. The court held that without further treatment, A.M. would remain in his current condition. It also held that A.M. "is gravely disabled and at a substantial risk of harm due to his inability to provide for his own essential needs of health and safety." This holding does not detail the risk of the physical harm that A.M. was likely to suffer.

Furthermore, the testimony in the record does not establish that without detainment, A.M is at risk of danger of serious physical harm resulting from his failure to provide for his essential human needs of health or safety. Regarding A.M.'s symptoms, Valley Cities's ITA evaluator, David Cornell, testified that that A.M. was "not making rational and reality-based decisions independently about his medical needs and medical care." Cornell also testified that there was "still the clinical concern about the quality and quantity of sleep," but he did not expand on the physical harm that A.M. could experience because of the lack of sleep or nonrational decision-making. Cornell also testified that if released, A.M. would quickly get re-hospitalized again for his same concerns regarding the need for a CT scan. Similarly, this testimony did not indicate any risks of physical harm if A.M. was not detained.

The findings of fact and Cornell's testimony are insufficient to support the finding that A.M. was at risk of serious physical harm. Our Supreme Court in *LaBelle* held that "the risk of physical harm from [an appellant's] tendency to neglect [their] health was too speculative and insubstantial to justify" a 90-day

9

commitment.[10]  107 Wn.2d at 214.  Similarly, in *In re Detention of A.M.*, we reversed and remanded when the record lacked evidence that the failure to take care of his needs placed A.M. in danger of serious physical harm.[11]  17 Wn. App. 2d 321, 334, 487 P.3d 531 (2021).  The *A.M.* court stressed that prong (a) requires that "there needs to be evidence not only of a failure to provide for nutritional needs but also that this deficiency was or could be harmful to the appellant."  *Id.* at 335.  Our case law supports that a finding of a danger of serious physical harm resulting from a failure to provide for essential human needs requires evidence of what serious physical harm is posed by the risk.  Because no substantial evidence exists of the danger of serious physical harm to A.M. without treatment, we reverse the trial court's finding that A.M. was gravely disabled.

We reverse.

WE CONCUR:

---

[10]  A 90-day commitment requires clear, cogent and convincing evidence. *LaBelle,* 107 Wn.2d at 214.  The State did not provide evidence that a potential for physical harm existed if the appellant continued to not eat.  *LaBelle,* 107 Wn.2d at 214.  This evidence would also be insufficient for a 14-day detainment under a preponderance of the evidence standard.

[11]  At trial, A.M.'s doctor testified that A.M. could not meet his basic health and safety needs or conduct his activities of daily living outside of a secured environment.  *A.M.*, 17 Wn. App. 2d at 334.  The court found that this statement was conclusory because there was no evidence of past or recent weight loss or any other health consequence from A.M.'s lack of eating or any inability to meet his activities of daily living.  *A.M.*, 17 Wn. App. 2d at 334.